UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**BILLY JOE UTLEY,**

        Plaintiff,           CASE NUMBER: 06-10472
                                      HONORABLE VICTORIA A. ROBERTS

v.

**PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY, a foreign
insurance company,**

        Defendant.
_____/

**OPINION AND ORDER**

**I.    INTRODUCTION**

    This is an employee benefits case governed by the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. 1001 et seq. ("ERISA").  Billy Joel Utley ("Plaintiff") sues Unum Provident Life and Accident Insurance Co. ("Defendant").  He claims that it wrongfully terminated and denied long-term disability benefits.  Plaintiff says he is unable to work because of severe back pain.  Before the Court is Defendant's motion to affirm its administrative decision and Plaintiff's motion to reverse Defendant's administrative decision.  For the reasons that follow, Defendant's motion is **GRANTED**; Plaintiff's motion is **DENIED**.

**II.    BACKGROUND**

*A. The Plan*

    Plaintiff worked for Oakwood Construction as a superintendent and was covered

by its Group Long-Term Disability Plan (the "Plan").  Defendant administers the Plan. The Plan states that it is governed by ERISA and vests Defendant with "broad discretionary powers" to make findings and determine eligibility for benefits.  Admin. R. at 850.

The Plan provides that an employee is eligible for long-term disability benefits ("LTD") if he is totally disabled.  An employee is considered "totally disabled" if he: (1) is unable to perform on a full or part-time basis each of the important duties of his own occupation because of an injury or sickness that started while insured under the policy; (2) does not work at all in any occupation; and (3) is under a physician's care. Defendant considers this the "own occupation" period and an employee is only allowed to collect benefits under this standard for two years.  After the "own occupation" period expires, an employee's benefits will continue if he is "totally disabled" – unable to work at all in any occupation for which he is or may become suited by education, training, or experience; and is under a physician's care.  Admin. R. at 866.

*B. The Illness*

As a superintendent, Plaintiff built 500-600 homes, two apartment complexes, and a storage building.  In 2000, Plaintiff was diagnosed with kidney stones.  He stopped working around January 30, 2000 due to the kidney stones and lower back pain.  He applied for disability benefits in November, 2000.  In support of his application, Plaintiff's attending physician, Abigail L. Neil, provided a report opining that Plaintiff suffered from low back pain and miminal degenerative change.  She restricted Plaintiff from heavy lifting and frequent bending.  In a telephone interview and in-person visit from a field representative, Plaintiff advised that he was unable to walk without a cane,

could not lift, could not bend, and that any physical activity causes him pain. In addition, Plaintiff stated that he spends most of his time at home, limping around and dealing with the pain. Admin. R. at 119-122. Defendant granted Plaintiff LTD benefits for two years.

On June 16, 2003, Defendant advised Plaintiff that his benefits were re-evaluated and approved under the "any occupation" standard, effective May 30, 2003.

Plaintiff saw multiple doctors and surgeons regarding his back pain and significant mobility limitations. The physicians included: (1) Dr. Neal; (2) Dr. Ahlgren (orthopedic surgeon); (3) Dr. Khan (pain management specialist; (3) Dr. Kim (physical medicine and rehabilitation doctor); and (4) Dr. Aloot (rheumatologist). Their findings:

1. November 16, 2000: Dr. Alghren noted significant limitations to Plaintiff's mobility and significant tenderness in his back area.

2. November 28, 2000: Dr. Alghren performed a discogram, which revealed degenerative changes in multiple spinal disks with the pain at 6/10 in severity.

3. September 2001: Dr. Khan diagnosed lumbar degenerative disk disease, lumbar muscle spasms, and left sacroiliac joint syndrome.

4. February 2, 2002: Dr. Khan performed a lumbar discogram to try to relieve Plaintiff's back pain.

5. November 2, 2002: Dr. Khan administered lumbar epidural steroid injections and noted that Plaintiff should not lift, climb, bend, stoop, kneel, squat, crouch, crawl, reach, or twist. He also noted that Plaintiff was able to lift or carry only two pounds occasionally.

6. April 28, 2003: Dr Kim noted that Plaintiff complained of severe back pain, headaches, pain in his legs, neck, and arms. Dr. Kim administered botox injections for Plaintiff's headaches and joint injections to relieve the pain throughout the rest of Plaintiff's body. He also prescribed physical therapy.

7. July, 2002: Dr. Aloot diagnosed inflammatory arthritis. She noted that

>Plaintiff was taking several medications: morphine, methadone, neurontin, zoloft, and naprosyn for his arthritis.

8. April 22, 2003: Dr. Aloot diagnosed osteoarthritis, chronic low back pain, and multiple trigger points of tenderness consistent with a fibromyalgia syndrome.

9. June 8, 2003: Dr. Khan stated that Plaintiff was totally disabled.

10. February 18, 2004: Dr. Khan performs surgery because of excess scar tissue.

11. May 30, 2004: Dr. Khan notifies Defendant that Plaintiff developed secondary conditions which include anxiety and depression.

12. June 7, 2004: Dr. Kim opines that due to cervical radiculopathy and back pain Plaintiff should be restricted to lifting 5 pounds.

13. August 12, 2004: Dr. Khan notes Plaintiff complains of persistent low back pain with radiation to his right leg, knee, and above.

In addition, Plaintiff's MRIs, CT Scans, and X-rays revealed that prior to his microdiskectomy in 2002, his cervical spine and discs were essentially normal. Plaintiff underwent the following diagnostic studies:

1. December 2, 1991: X-ray of lumbosacral spine; normal.

2. September 17, 2002: MRI of cervical spine; normal. There is no evidence of disk herniations.

3. November 6, 2000: MRI of the lumbar spine; minimal degenerative change. No disk protrusion or herniation is identified.

4. January 9, 2001: Bone scan; No definite abnormal findings in the osseous structures of the low back to explain Plaintiff's pain.

5. February 6, 2002: Multiple studies of the lumbar spine; No findings to suggest disk herniation or annular tear.

6. June 23, 2002: X-ray of lumbar spine; No acute fracture or sublaxtion.

7. August 16, 2002: Electromyography-nerve conduction study; No evidence of lumbar radiculopathy or peripheral polyneuropathy.

In January 2003, Defendant hired Dr. Geron Brown ("Brown"), a orthopedic surgeon, to review Plaintiff's file. Dr. Brown noted that Plaintiff's primary complaint was pain, which could not be objectively verified. He also noted that there were definite arthritic changes in Plaintiff's sacroiliac joints and degenerative change in his lumbosacaral spine. Dr. Brown opined that Plaintiff may be capable of sedentary work but it would be difficult to place restrictions and limitations on him due to his back pain. Further, he noted that Plaintiff's consumption of narcotic prescriptions raised safety concerns regarding driving, operating or working on moving machinery, or working at unprotected heights. Defendant continued LTD benefits.

*C. The Surveillance*

In February, 2005, Defendant decided to obtain a medical examination of Plaintiff and conduct surveillance. The surveillance occurred on February 16, 17, and 19. On February 16, 2005, Plaintiff was scheduled to attend a medical examination with Dr. Philip Friedman, a neurosurgeon. On that same day, an investigator observed and videotaped Plaintiff walking with a cane, hunched over, and walking with a limp.

During the medical examination, Plaintiff advised Dr. Friedman that he could only walk short distances with a cane, could not stand for more than ten minutes, and could sit for a half hour or more. Dr. Friedman examined Plaintiff, reviewed his MRI scans, and opined that Plaintiff appeared impaired due to muscle spasms, tightness of the paraspinals and altered dynamics of his back muscles. Although Dr. Friedman noted that he could not identify the "pain generator," he did find Plaintiff totally disabled by his chronic back pain.

5

Surveillance continued but was unavailing. Then, on April 16, 2005, one of the investigators by happenstance observed Plaintiff at his son' soccer game. The investigator videotaped Plaintiff walking without a cane, kneeling, ascending steps, walking back and forth along the sidelines, walking up and down a hill, carrying a plastic bag with items in his left hand and, at the same time, with the assistance of his son, carrying a cooler to his vehicle. The investigator gave Defendant the video surveillance.

Defendant sent a copy of the video surveillance to Dr. Friedman and requested his review. Dr. Friedman stated that the physical activities of Plaintiff in the video surveillance were "quite troubling." He further stated that Plaintiff's activities compromised the credibility of his descriptions of his extreme degree of limitation. Based on the videotape, Dr. Friedman opined that Plaintiff had a capacity for "light work."

On July 5, 2005, Defendant referred Plaintiff's file to Genex Services, a case management provider, for a vocational assessment. Genex decided that based on Plaintiff's work experience, educational background, and medical condition he was qualified to engage in light work occupations.

*D. The Denial*

On July 13, 2005, Defendant informed Plaintiff of its decision that he was no longer eligible for benefits because Plaintiff was capable of performing light or sedentary work. Defendant based its decision on the findings of Dr. Friedman, the video surveillance, and the vocational assessment.

Plaintiff appealed the decision on August 2, 2005. On appeal, Plaintiff's file was again reviewed by Dr. Friedman and two other doctors of physical medicine and

rehabilitation, Dr. David Frank and Dr. Andrew Krouskop. They all concluded that medical diagnoses in correlation with the video surveillance raised questions regarding Plaintiff's alleged total disability. Dr. Frank was unable to determine if there was a total lack of functional ability given the video surveillance and Plaintiff's medical history. Dr. Friedman and Dr. Krouskop, however, both opined that Plaintiff was capable of "light work." On December 19, 2005, Defendant affirmed its denial of benefits.

### III.   STANDARD OF REVIEW

"As a general principle of ERISA law, federal courts review a plan administrator's denial of benefits *de novo*, 'unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 168 -169 (6th 2003)(citing *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir.1998)( citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). When a plan administrator has discretionary authority to determine benefits, the Court will review a decision to deny benefits under "the highly deferential arbitrary and capricious standard of review." *Id.* at 169 (citing *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir.1996)).

Here, the Plan grants the Administrator authority to administer and interpret the Plan. Therefore, the arbitrary and capricious standard applies. This deferential standard of review is appropriate when the ERISA plan provides the plan administrator with discretion and the decision being appealed was made in compliance with plan procedures. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 597 (6th Cir. 2001). The

arbitrary and capricious standard of review "is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n Inc.*, 331 F.3d 536, 541 (6th Cir. 2003)(internal citations and quotations omitted). Put differently, a decision regarding eligibility for benefits is not arbitrary or capricious if the decision is "rational in light of the plan's provisions." *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988). A decision reviewed under this standard must be upheld if it is supported by "substantial evidence." *Baker v. United Mine Workers of Am. Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

The Court will be attentive in applying this standard of review because Defendant funds and administers the Plan. *See Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 115 (1989)(stating that courts should be attentive to conflicts of interest in this context); *see also Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 847 n.4 (6th Cir. 2000)(noting a potential for self-interested decision making when the plan sponsor bears all or most of the risk of paying claims, and also appoints the body designated as the final arbiter of such claims). Because the Sixth Circuit "has rejected the notion that the conflict of interest inherent in self-funded and self-administered plans alters the standard of review," the Court will consider Defendants' potential conflict of interest while applying the arbitrary and capricious standard. *McCartha v. Nat'l City Corp.*, 419 F.3d 437 (6th Cir. 2005).

**IV.   ANALYSIS**

    **A.   Medical Diagnoses and Defense Examinations**

Plaintiff argues that Defendant's denial of LTD benefits is arbitrary and capricious because it relied on the medical reports of its own examiners, despite the overwhelming reports of Plainiff's physician's stating he is totally disabled.  For example, Plaintiff argues that Defendant credited Dr. Brown's diagnosis, who only conducted a file review, and Dr. Friedman's diagnosis, who only examined Plaintiff once, over Dr. Khan, who treated Plaintiff.  In addition, Plaintiff contends that the examinations were not independent because Defendant retained these physicians to specifically find that he is not disabled.

"Courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)(rejecting the application of the "treating physician" rule to ERISA cases).  Moreover, "when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald*, 347 F.3d at 169.

In a variety of circumstances, the Sixth Circuit rejected an administrator's reliance on the conclusion of a so called independent medical examiner or vocational expert if the expert's opinion was based on a selective medical record, failed to include examination of the claimant or failed to address key components of the medical record.

9

*See, e.g., Evans v. UNUM Provident Corp.*, 434 F.3d 866 (6th Cir.2006) (finding administrator acted arbitrarily and capriciously by relying solely on file review by in-house physician); *Moon v. UNUM Provident Corp.*, 405 F.3d 373, 381(6th Cir. 2005) (finding an administrator's reliance on opinion by in-house physician based solely on selective review of the record arbitrary).

Here, in contrast, each of the defense doctors who reviewed Plaintiff's file were board certified in their medical specialty and reviewed the medical records from all five of Plaintiff's doctors. Indeed, Dr. Friedman examined Plaintiff and made objective findings similar to Plaintiff's own treater, Dr. Khan. While Dr. Brown and Dr. Friedman both raised concerns about the restrictions and limitations placed on Plaintiff based on the physical findings in Dr. Kahn's file, they both ultimately agreed that Plaintiff was incapable of work due to his pain issues. It was not until he reviewed the surveillance video that Dr. Friedman changed his diagnosis.

During the appeal process, Dr. Khan submitted two letters reiterating that Plaintiff could not sit, stand, or walk for more than 30 minutes at a time and that prescriptions medicines were the only thing helping Plaintiff's condition. It is unclear whether Dr. Khan reviewed the video surveillance. However, it is clear that his diagnosis is inconsistent with the investigator's observation of Plaintiff at his son's soccer game for over 50 minutes. Therefore, the Court cannot say Defendant erred in relying in part on the findings of physicians it selected, such as Dr. Friedman and Dr. Kouskop.

Moreover, the Court cannot say that Defendant arbitrarily disregarded the assessments and instructions of Plaintiff's doctors. In fact, Defendant relied on their assessments for almost four years and only chose to not embrace their disability

10

conclusions after obtaining direct evidence which showed Plaintiff engaged in the exact activities he previously claimed he could not do. In the context of an ERISA disability plan, neither Courts nor plan administrators must give special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. at 834.

Plaintiff claims that Defendant's decision is undermined by its hiring of doctors. The fact that Defendant relied on the reports of the physicians it hand-selected and paid, rather than the Plaintiff's personal physicians, is a factor which must be taken into consideration. Under such circumstances, "the potential for self-interested decision-making is evident." *See Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 292 (6th Cir.2005) (citation omitted) ("As the plan administrator, [the defendant] had a clear incentive to contract with individuals who were inclined to find in its favor that [the plaintiff] was not entitled to continued LTD benefits."). However, there is nothing in the record to indicate that Defendant's doctors did not thoroughly review Plaintiff's file or exercise independent judgment. The Court rejects Plaintiff's argument that an additional conflict on interest exists based on Defendant's hiring of medical examiners.

**B.     Video Surveillance**

Plaintiff argues that Defendant's decision was arbitrary and capricious because it was based on the surveillance video. Specifically, Plaintiff argues that the surveillance video is unreliable because the activities captured on the surveillance video are not a complete picture of his activities.

For example, Plaintiff contends that it cannot be gleaned from the videotape whether Plaintiff was comfortable or in pain when he walked, stood, and carried the ice chest. He also argues there is no way to tell the weight of the ice chest or if it has

11

contents. Further, Plaintiff asserts that the 16 minute video from April 16, 2005 lacks evidentiary value because it is not streaming video and shows Plaintiff at different times during the game.

The use of surveillance video to document a claimant's abilities is appropriate under ERISA. *See Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1274 (11th Cir. 2002); *see also Briggs v. Marriott Int'l, Inc.*, 368 F.Supp.2d 461, 471 (D.Md. 2005)(stating the video surveillance coupled with the opinion of physicians justified the administrator's conclusion that the claimant was capable of performing his occupation).

This particular video shows Plaintiff standing, walking, carrying an ice chest (with the assistance), kneeling, and squatting for longer than 10 minutes. Plaintiff does not dispute that the video surveillance shows him engaged in these activities; instead, he argues that the video is unreliable because it was taken on only one occasion. Plaintiff contends that his medications are more effective on some days than others, and that he attempts to lead a normal life by driving, leaving his house, and spending time with his son within the restrictions imposed by his doctors. While this may be true, the video calls into question Plaintiff's credibility; it shows him engaged in activity that he stated that he was unable to do. *Schindler v. Metro. Life Ins. Co.*, 141 F.Supp.2d 1073, 1081 (M.D.Fla. 2001).

In support of its reliance on the video, Defendant cites *Tsoulas v. Liberty Life Assurance Company of Boston*, 397 F.Supp.2d 79 (D.Me. 2005) and *Onofrieti v. Metro. Life Ins. Co.*, 320 F.Supp.2d 1250 (2004). Plaintiff argues that both cases are inapposite. The Court disagrees.

In *Tsoulas*, the plaintiff stated she was incapable of walking, standing, or leaving her house. *Tsoulas*, 397 F.Supp.2d at 85. Yet, the defendant's surveillance video captured her driving, traveling to a tanning salon, walking, ascending stairs, and entering and exiting various establishments. *Id.* at 86. The defendant referred the plaintiff's file to a doctor who concluded that the recent observations indicated that she was capable of performing light work. *Id.* Based on these findings, the defendant terminated Plaintiff's long-term disability benefits. The Court found that the surveillance provided reasoned support for the defendant's denial of benefits and affirmed its decision. *Id.* at 98.

Similarly, in *Onofrieti*, the plaintiff's self-reported physical capacities drastically differed from what was captured on the video surveillance taken by the defendant. *Onofrieti*, 320 F.Supp.2d at 1251. In an evaluation sent by the defendant, the plaintiff stated that she was unable to get out of bed until noon, was unable to sit or stand, and unable to do any type of housework. The surveillance, however, revealed that she was able to shop for extended periods of time; able to load a car with groceries, able to lift and carry a young child, and able to walk with no apparent difficulty. *Id.* at 1252. The defendant terminated the plaintiff's long-term disability benefits. The Court held that the administrator did not err in denying the plaintiff's claim because her statements were completely contrary to her demonstrated abilities while her physicians relied on her subjective claims of pain. *Id.* at 1255.

This Plaintiff's claims to his doctors and Dr. Friedman regarding his limitations are completely contradictory to the abilities displayed on the video. Although, the video does not reveal whether Plaintiff carried an empty ice chest, was under heavy dosage of

13

medication, or suffered from residual pain the next day, the video is objective evidence that Plaintiff's physical capabilities exceed that which he reported to his doctors.

Dr. Friedman found Plaintiff's subjective description of his limitations to be reasonably credible and consistent with his physical findings on February 16, 2005. But based on the surveillance, he concluded that Plaintiff does demonstrate a capacity for light work. Admin. R. 00743.

This Court has reviewed the video surveilance. Even though the video shows Plaintiff engaging in a wide-range of activities inconsistent with his alleged limitations, he does appear to have a stiff-legged gait. Although the surveillance is subject to different interpretations, it is not this Court's duty to determine which interpretation is more plausible. Rather, the question is whether the video in combination with other evidence, supports Defendant's termination of benefits.

Defendant points to Dr. Friedman's report, Plaintiff's own medical records, and the purported contradiction between his self-reported limitations and the surveillance as the basis for its conclusion that Plaintiff is able to perform light work. Given the standard of review and the difficulty in objectifying Plaintiff's complaints of pain, there is "substantial evidence" to support Defendant's conclusion.

### C. GENEX's Vocational Assessment

In his reply brief, Plaintiff argues that Defendant's reliance on Genex's vocational assessment was arbitrary and capricious. Plaintiff contends that Defendant did not provide Genex with his complete medical file to review.

In 2003, Defendant submitted Plaintiff's file to Genex for a vocational assessment. Genex interviewed Plaintiff and reviewed his medical file. Genex

14

determined that based on Plaintiff's education, experience, training, and work restrictions there were numerous sedentary positions available.  Admin. R. 1-35.  In 2005, Genex again reviewed Plaintiff's file and determined that he was capable of working as a garage store manager, shop superintendent, building-service supervisor, or manager of an apartment house.  Admin. R. 747-755.

Plaintiff, argues that Genex made this assessment without his most up to date medical evaluations.  He notes that Defendant provided Genex with Dr. Friedman's letter stating he could perform light work, but did not provide Dr. Friedman's February 16, 2005 report stating Plaintiff was disabled.  Plaintiff asserts that this omission resulted in the generation of a biased report by Genex which Defendant unreasonably relied on.

The Sixth Circuit has rejected an administrator's reliance on the conclusion of a vocational expert if the expert's opinion was based on a selective medical record, failed to include examination of the claimant or failed to address key components of the medical record. *See, e.g., Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir.2002) (applying arbitrary and capricious review and rejecting administrator's reliance upon the opinion of a vocational consultant where the employer had "cherry-picked" the medical information it had provided to the consultant).

Why Defendant did not provide Plaintiff's complete medical file is inexplicable.  The Court finds Defendant's failure to ensure that Genex reviewed Plaintiff's complete file and not rely on select documentation arbitrary and capricious.  However, whether discrete acts by a plan administrator are arbitrary and capricious is not the ultimate issue in an ERISA denial of benefits case.  *Spangler,* 313 F.3d at 362.  Rather, it is

whether Defendant's ultimate decision denying benefits was arbitrary and capricious. Defendant's decision was based on substantial evidence that Plaintiff is capable of performing light work, as explained above. Therefore, the decision was not arbitrary and capricious.

## V.  CONCLUSION

The Court **AFFIRMS** Defendant's denial of benefits.

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  March 26, 2007

> The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 26, 2007.
>
> S/Linda Vertriest
> Deputy Clerk